Michael C. O'MALLEY, et al.,
petitioner, Appellants,

v.

ULLAND BROTHERS, et
al., Respondents,

Max Johnson Trucking, Respondent.

No. C1–94–2110.

Supreme Court of Minnesota.

June 6, 1996.

Rehearing Denied July 8, 1996.

Kenneth R. White, Farrish, Johnson & Maschka, Mankato, for Appellants.

Janet Stellpflug, Gilmore, Aafedt, Forde, Anderson & Gray, P.A., Minneapolis, for Respondents.

## OPINION

ANDERSON, Justice.

Michael C. O'Malley, an employee of Max Johnson Trucking, was injured when the "belly-dump" truck driven by him was struck from behind by a road grader driven by Ulland Brothers, Inc. employee, John Lee. At the time of the injury, O'Malley was working on a repair project for Interstate Highway 90 near Stewartville, Minnesota. Ulland Brothers was the general contractor for the project and Max Johnson was a subcontractor hired by Ulland Brothers. Following his injury, O'Malley applied for and received workers' compensation benefits from Max Johnson. O'Malley and his wife, Mary Jo, also sued Ulland Brothers and Lee for damages, alleging negligence. Ulland Brothers and Lee brought Max Johnson into the action as a third-party defendant. Ulland Brothers and Lee then moved for summary judgment, asserting that O'Malley's action was precluded by the "common enterprise" exception to the rule that an injured employee may bring a tort action against a third party. Max Johnson also moved for summary judgment. The district court granted both summary judgment motions, and on appeal the Minnesota Court of Appeals affirmed. We affirm.

The material facts are not in dispute.[1] Respondent Ulland Brothers, Inc. was the general contractor for the repair of a ten-mile section of Interstate 90 near Stewartville, Minnesota. The project involved removal of the existing pavement, excavation of any soft spots by digging a "subcut" in the soft area, refilling the area with a more stable material, and then repaving. Ulland Brothers subcontracted with respondent Max Johnson Trucking to load, haul and stockpile sand, gravel and bituminous material to and from the construction site and to maintain the hauling road. Ulland Brothers and other subcontractors excavated the material from the roadway, and Max Johnson hauled the excavated material away in "belly-dump" trucks,

---

1. O'Malley asserts that whether a Max Johnson employee removed a part of the road shoulder with a front end loader is in dispute. This is the only fact dispute alleged by O'Malley. However, Ulland Brothers agreed, for purposes of the summary judgment determination, to accept O'Malley's version of the facts. Moreover, even if this fact were actually disputed, it is difficult to imagine how it might affect the outcome of the matter.

trailers or tandem trucks, and dumped it in a pit about one mile from the construction site.

The construction site activities of Ulland Brothers and Max Johnson required that Ulland Brothers employees work in close harmony with the Max Johnson drivers in the process of removing the old material, loading it up, and hauling it away. The material removed from the construction site was deposited in a pit by the Max Johnson drivers, and then leveled by a Ulland Brothers employee operating a bulldozer. The Ulland Brothers superintendent would decide which area to excavate or subcut and communicate his decision to the Max Johnson supervisor. Both Ulland Brothers and Max Johnson employees did the filling of a particular subcut. Ulland Brothers kept a road grader in the portion of the subcut that was being filled. The granular material, called "sugar sand," used to fill the subcut was loaded on the Max Johnson trucks from the same pit to which the excavated material had been hauled. The Ulland Brothers supervisor directed the trucks by pointing to the area where he wanted the sugar sand dumped, and it was understood that it was the supervisor's responsibility to assist Max Johnson drivers if they should get stuck during the dumping process.

Belly-dump trucks tended to become stuck in the sugar sand because the load was dumped underneath the truck and in front of the rear wheels. If a belly-dump truck got stuck, a road grader or a bulldozer would be used to push the truck out of the sand by coming up behind the truck, slowly connecting with the belly-dump's "stinger," and pushing the stuck belly-dump out of the sand. The stinger is a metal device protruding from the rear of the belly-dump truck, placed there for use when the truck is pushed from behind. Ulland Brothers instructed its employees on how to properly push belly-dump trucks which had become stuck in the sand.

On July 2, 1991, appellant Michael C. O'Malley was driving a belly-dump truck for Max Johnson. Respondent John Lee, a Ulland Brothers employee, was driving a road grader equipped with a 10– to 12–foot blade. Lee was smoothing out the sand which was being placed in a subcut and was also pushing out trucks which became stuck in the sand. Lee stated in his deposition that he pushed out about 20 trucks an hour. He acknowledged that "truck after truck" would get stuck. When describing how Ulland Brothers and Max Johnson employees worked together on the project, Lee explained:

> Max Johnson worked with us. We worked together all summer. Sometimes they'd haul material to our plant, sometimes they were hauling in the roadbed, sometimes we'd get a few of their trucks, we'd ask to get their trucks and they'd help us. They'd help us to haul dirt out, or if we needed a truck or if—and we worked together all summer that way. It was varying degrees. That particular day, [the day of the accident] they were hauling sand. Most other days they were doing whatever we needed or they needed. * * * [W]e'd send messages through each other, their boss or our boss would say, you know, we've got to get this done, or we need a different kind of material, or I'm going to have enough material. So we'd tell the Max Johnson people, they'd go tell their loader operator, or we'd borrow equipment back and forth once in a while. * * * [I]f they wanted something watered, Johnson did, because their trucks were hauling, we'd go water it for them. If we needed a truck to haul something, they'd give us a truck. If they wanted the road bladed, it was getting too rough for their trucks, I'd go blade it for them. I'd tell Mike [O'Malley] we were getting enough material or how much I needed and cut him off.

When asked whether everyone involved in the operation knew in general what everybody's job was and tried to observe each other and to integrate the effort, Lee answered, "We have to, sir, or else we'll have chaos."

Ulland Brothers' superintendent stated that Max Johnson and Ulland Brothers employees were equally subject to hazardous conditions at the site, including: fires or explosions from gas pipes or other causes; extreme weather conditions; collisions between vehicles or pieces of equipment operat-

ed by workers on site; or collisions between a vehicle or piece of equipment and a worker on the ground. The general manager for Max Johnson stated that all employees on the project were exposed to the same hazards, including fire or explosion, collisions between vehicles or between vehicles and people, vehicle rollovers, and exposure to hazardous materials.

On the day of the accident, public highway traffic was not routed through the project, and there was no risk from such traffic for any of the workers. O'Malley was delivering sugar sand to subcut no. 6 and had partially dumped his load when he became stuck in the sand. Lee, driving a road grader, approached O'Malley's truck from behind in order to push it out of the sand. Lee's truck made contact with O'Malley's and pushed it free. O'Malley stated that he was jolted on the impact, thrown to the floor of the truck, and injured. O'Malley filed for and collected workers' compensation benefits from Max Johnson's insurer for the injury he sustained in this accident.

O'Malley subsequently commenced an action against Ulland Brothers, alleging negligence, and seeking past and future medical costs and other damages. O'Malley's wife, Mary Jo, sought damages for loss of consortium. Ulland Brothers and John Lee filed a third-party complaint against Max Johnson, alleging, among other things, negligence in failing to provide a safe workplace and negligence in failing to train its employees in the safe operation of a belly-dump truck, as well as negligent operation of the belly-dump truck itself.

Ulland Brothers and Lee moved for summary judgment, arguing that Ulland Brothers and Max Johnson were engaged in a common enterprise, and therefore O'Malley's election to receive workers' compensation benefits from Max Johnson precluded his additional claim against Ulland Brothers. Max Johnson moved for summary judgment on the third-party complaint and supported Ulland Brothers' motion for summary judgment. The district court granted both motions and dismissed all claims. The court found that Ulland Brothers and Max Johnson were engaged in a common enterprise and that O'Malley's negligence action was precluded because he had elected to receive workers' compensation benefits from his employer. O'Malley appealed, and the court of appeals affirmed the district court.

## I.

Summary judgment is proper when there is no genuine issue of material fact and either party is entitled to judgment as a matter of law. Minn.R.Civ.P. 56.03. On appeal from summary judgment, the role of the reviewing court is to review the record for the purpose of answering two questions: (1) whether there are any genuine issues of material fact to be determined, and (2) whether the district court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). A fact is material if its resolution will affect the outcome of a case. *Zappa v. Fahey*, 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976). In reviewing a granted motion for summary judgment, the facts must be taken in the light most favorable to the party against whom summary judgment was granted. *Schleicher v. Lunda Constr. Co.*, 406 N.W.2d 311, 312 (Minn.1987). This court has stated that application of a statute to a set of undisputed facts is a question of law, not binding on this court. *See A.J. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.*, 260 N.W.2d 579, 582 (Minn. 1977).

The parties disagree whether the Workers' Compensation Act (the Act) should be interpreted and applied liberally to protect the right of the worker, or on an "even-handed basis." O'Malley argues that the court of appeals erred in applying the "even-handed" standard. Ulland Brothers maintains that there is a distinction between the "liberal construction" of the Act and the even-handed standard expressed in the Act. A review of some history of the Act and its interpretation is useful in examining this issue.

Before the enactment of the Act in 1913, employees injured on the job could proceed against their employers under common law negligence or other common law

theories. The Act provided for an election of remedies between recovery from the employer under the Act or recovery from a third party. This election of remedies requirement originally limited the employee's recovery from a third party to the amount of benefits available under the Act. The legislature amended the Act in 1923, removed that limitation to the amount of benefits, and provided that the application of the subdivision 1 election of remedies is limited to situations where the employer and the third party are engaged in a "common enterprise" or in the "accomplishment of the same or related purposes." The Act currently provides that, under certain circumstances, an employee who is injured in a work-related accident must choose between workers' compensation benefits from the employer and damages from a third-party defendant involved in the injury:

> Subdivision 1. **Election of remedies.** If an injury or death for which benefits are payable occurs under circumstances which create a legal liability for damages on the part of a party other than the employer and at the time of the injury or death that party was insured or self-insured in accordance with this chapter, the employee, in case of injury, or the employee's dependents, in case of death, may proceed either at law against that party to recover damages or against the employer for benefits, *but not against both.*

Minn.Stat. § 176.061, subd. 1 (1994) (emphasis added).

In 1943, in *Gleason v. Geary,* this court examined the legislative purpose underlying the 1923 amendment and determined that:

> Unquestionably the legislative purpose [of the 1923 amendment] was to enlarge the rights and remedies of the injured workman. His employer, under the original act, was well taken care of, and these rights under the second subdivision of the amended act were retained for him.

*Gleason v. Geary,* 214 Minn. 499, 508, 8 N.W.2d 808, 812 (1943). The amended Act, applicable at the time of O'Malley's injury, provides:

> Subdivision 4. **Application of subdivisions 1, 2, and 3.** The provisions of subdi-

visions 1, 2, and 3 apply only if the employer liable for benefits and the other party legally liable for damages are insured or self-insured and engaged, in the due course of business in, (1) furtherance of a common enterprise, or (b) in the accomplishment of the same or related purposes in operations on the premises where the injury was received at the time of the injury.

Minn.Stat. § 176.061, subd. 4 (1994). This subdivision sets out the "common enterprise" defense. The purpose of the election of remedies provision in subdivisions 1 and 4 is to prevent a double recovery by an injured person from both the employer and a third party where "the masters have joined forces and in effect have put the servants into a common pool." *Gleason,* 214 Minn. at 511, 8 N.W.2d at 814.

In 1958, this court stated that "the plaintiff should have the benefit of the rule of construction that the Workmens' Compensation Act must always be construed most liberally in favor of the injured workman." *McCourtie v. United States Steel Corp.,* 253 Minn. 501, 510–11, 93 N.W.2d 552, 559 (1958). The rule of construction established by *McCourtie* remained unaltered until 1983, when the legislature amended chapter 176, and specifically stated that: "[q]uestions of law arising under chapter 176 shall be determined on an *even-handed basis* in accordance with the principles laid down in section 176.001." Minn.Stat. § 176.021, subd. 1a (1994) (emphasis added).

Minnesota Statute section 176.001, as enacted in 1981 and amended in 1983, specifically sets forth the intent of the legislature with respect to interpretation of the Act:

> It is the intent of the legislature that chapter 176 be interpreted so as to assure the quick and efficient delivery of indemnity and medical benefits to injured workers at a reasonable cost to the employers who are subject to the provisions of this chapter. *It is the specific intent of the legislature that workers' compensation cases shall be decided on their merits and that the common law rule of "liberal construction" based on the supposed "remedial" basis of workers' compensation legislation shall*

*not apply in such cases.* \* \* \* the legislature hereby declares that the workers' compensation laws are not remedial in any sense and are not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand.

Minn.Stat. 176.001 (1994) (emphasis added).

The court of appeals, in applying the Act, looked to the legislative intent stated in section 176.001, and attempted to apply the "even-handed" standard. The court stated, referring to section 176.001, that "[u]nder these provisions, we cannot liberally construe the workers' compensation law in an attempt to favor the injured worker." *O'Malley v. Ulland Bros.*, 529 N.W.2d 735, 739 (Minn. App.1995).

In two of our cases decided after the 1983 amendments to the Act, we have discussed the construction of the Act. We said, "Statutes are to be construed so as to yield reasonable results, consistent with the admonition contained in Minn.Stat. § 176.001 (1984) that the Act is to be construed in a nondiscriminatory manner." *Hagen v. Venem,* 366 N.W.2d 280, 284 (Minn.1985); *see also Foley v. Honeywell,* 488 N.W.2d 268, 271–72 n. 2 (Minn.1992). We hold that the even-handed standard is the correct standard to apply in determining questions of law under the Act. The even-handed standard permits the Act to be construed to yield reasonable results consistent with prior decisions of this court and with the legislative intent of section 176.001—that is to say, that the Act shall be construed in a nondiscriminatory fashion.

## II.

We now address the question whether Ulland Brothers and its employee John Lee are immune from suit by O'Malley because Ulland Brothers was engaged in a "common enterprise" with Max Johnson Trucking. Under Minn.Stat. § 176.061, subds. 1 and 4, an injured employee must choose between receiving workers' compensation benefits from the employer and a common-law negligence action against a third party when the employer and the third party are engaged in

furtherance of a common enterprise. Ulland Brothers asserts that it was engaged in furtherance of a common enterprise with Max Johnson.

In *McCourtie,* this court explained that a common enterprise exists if all of the following three factors are met:

(1) The employers must be engaged on the same project;

(2) The employees must be *working together* (common activity); and

(3) In such fashion that they are subject to the same or similar hazards.

*McCourtie,* 253 Minn. at 506, 93 N.W.2d at 556; *Kaiser v. Northern States Power Co.,* 353 N.W.2d 899, 906 (Minn.1984). This court has applied the *McCourtie* factors in several cases, and has stated that the common activities of the workers are considered, not the common activities of the employers. *Schleicher,* 406 N.W.2d at 313. This court has also stated that mere delivery does not establish a common enterprise. *Id.* at 314; *Urbanski v. Merchants Motor Freight,* 239 Minn. 63, 71, 57 N.W.2d 686, 691 (1953) (holding common carrier delivering merchandise to a manufacturer was not engaged in the same project with the manufacturer— even though they joined in unloading merchandise from the truck).

This court stated the rationale for the common enterprise protection of third parties as early as 1926:

if the third party bore a certain relation to the employer, and was itself under the compensation act, then the employe should be confined to his remedy under the compensation act. From a civic, economical and sociological point of view this position is sound. This reasoning rests upon the fact that the employe should get from the third party the same award that he would get from his own employer if it alone were responsible for the acts proximately causing his injury. Being engaged in a 'common enterprise' or in the 'accomplishment of the same' or 'related purposes' in operation on the premises puts all the employers so engaged in the relative, if not actual, position of an employer of any such employe. \* \* \* In short, the community of

interest gives the third party, who is subject to the compensation act, under this statute the status of an employer toward the employe.

*Rasmussen v. George Benz & · Sons,* 168 Minn. 319, 325, 210 N.W. 75, 77 (1926).

### A. Same project.

 The first factor of the *McCourtie* test requires that the employers be working on the "same project" for the employers to be engaged in a common enterprise. In *McCourtie,* the plaintiff was a plumber who was struck by a piece of steel dropped by a steel construction worker at the site. In holding that no common enterprise existed, this court stated that where two employers perform different types of work, and the performance of the jobs is "not related except in a vague, general way looking toward the completion of a structure, and where the activities of the two sets of employees have nothing in common and do not share or join in any of the work between themselves," the *McCourtie* test was not satisfied. *McCourtie,* 253 Minn. at 510, 93 N.W.2d at 559. In *Urbanski,* this court held that a common carrier delivering refrigerator shelves to a refrigerator manufacturer was not engaged in the same project, even though employees of both unloaded the shelves at the loading dock. *Urbanski,* 239 Minn. at 71, 57 N.W.2d at 690–91. The court observed that

> a more substantial relation must exist between the employer and the third party to bring them within this subdivision. Not every contact between an employer and a third party in the course of conducting their separate businesses constitutes engagement by them on the same project. The endless variety of possible fact situations that may arise prevents us from attempting an all-inclusive definition of the term "project."

*Id.; see also Higgins v. Northwestern Bell Telephone Co.,* 400 N.W.2d 192 (Minn.App. 1987), *pet. for rev. denied* (Minn., March 25, 1987) (Northwestern Bell and Western Electric were engaged on the same project where both companies installed, maintained and modified the same equipment over a long-standing, close commercial relationship); *Ritter v. M.A. Mortenson Co.,* 352 N.W.2d

110 (Minn.App.1984) (steel worker's and crane operator's employers at construction of an MTC garage were engaged on the same project).

On this construction project, the employers shared equipment, assisted in hauling for each other, coordinated the work flow by sending messages through each other, prepared road surfaces for each other by blading or watering, and assisted each other in extricating vehicles stuck in the fill material. As in *Higgins,* the employers shared functions and had a long-term relationship. We conclude that Ulland Brothers and Max Johnson were engaged in the same project.

### B. Working together (common activity).

 The second factor of the *McCourtie* test is that the employees must be "working together" or engaged in a "common activity." Merely working toward a common goal is not sufficient to constitute working together. *Schleicher,* 406 N.W.2d at 313. "The statute requires a common activity of both sets of employees, and the injured employee must be engaged in that common activity before he is deprived of his common-law right of action for negligence." *McCourtie,* 253 Minn. at 508, 93 N.W.2d at 558. Working together requires that the activities of the employees be more than "overlapping minimally"; they must be "interdependent." *Schleicher,* 406 N.W.2d at 313–14. In *Schleicher,* the plaintiff, a driver for a subcontractor, a ready-mix concrete company, was injured while delivering and unloading concrete at a construction site. He sued the general contractor and another subcontractor after collecting workers' compensation benefits from his employer. The court held that mere delivery does not establish a common enterprise. The ready-mix company supplied concrete to a highway construction site. A subcontractor at the site operated a hopper-conveyer system to transfer the concrete to the crew. The common enterprise test focuses on the activities of the workers, rather than the common goals of the employers, and in *Schleicher* there was little overlap between the work of the subcontractor and the ready-mix company employees—and this court con-

cluded that no common enterprise existed. *Id.*

O'Malley argues that *Schleicher* determines the outcome of this case, and asserts that Max Johnson was merely delivering material to the site, and therefore was not engaged in a common enterprise. O'Malley states that, as in *Schleicher,* the duties of the employees were not "inter-dependent except in the general way that construction work depends on delivery." *Id.* at 313–14. O'Malley further argues that, as in *McCourtie,* the employees had different functions. O'Malley's reliance on *McCourtie* for this comparison is misplaced. In *McCourtie,* the employees, a plumber and a steelworker, did not share any integrated duties beyond working on the same building. The timing of the plumbing and steel components was such that plumbers should not be in the same area as the steel workers. *McCourtie,* 253 Minn. at 512, 93 N.W.2d at 560. It was "never contemplated that [the] employees should work together." *Id.*

Here, both employers were engaged in the same space with coordination of their work as an integral part of the construction. It was not only contemplated that they would work together, it was essential to avoid chaos at the site. The record reveals that Max Johnson belly-dump trucks dumped sugar sand into the subcut. Ulland Brothers' superintendent and Max Johnson's general manager coordinated these actions among all the employees. Subcut no. 6 could not have been filled without leveling by Ulland Brothers, nor could it have been filled without dumping by Max Johnson. The employees were engaged in activities together throughout the summer, exchanging equipment and seeking advice from the supervisors of both employers. Max Johnson was required to maintain the hauling road, and Ulland Brothers sometimes "bladed" the road for Max Johnson. These facts demonstrate that Max Johnson did more than merely deliver material to the site. Unlike *Schleicher,* the duties of the Ulland Brothers and the Max Johnson employees overlapped substantially and were interdependent beyond the general way that construction work depends on delivery. The second factor of the *McCourtie* test is met.

We conclude that these employees were working together on this same project.

## C. Same or similar hazards.

■ The third *McCourtie* factor requires that employees be subject to the same or similar hazards for the court to find that a common enterprise existed between the two employers. In *Kaiser,* the two groups of employees were subject to different risks in fighting a hotel fire. The court determined that, under the facts and circumstances of that case, firefighters were subject to greater risk than power company employees, whose only function was to shut off the gas. *Kaiser,* 353 N.W.2d at 906.

The court of appeals examined the issue of similar hazards in *Higgins.* In that case, an employee of Western Electric slipped and fell in a washroom in the Northwestern Bell Telephone Company building. He received workers' compensation benefits from his employer, and sued the third party Northwestern Bell. Western Electric work crews installed Western Electric telephone equipment in the Northwestern Bell facility. Northwestern Bell crews did the final wiring and maintenance work on the equipment once it was installed and in operation. The court determined that the employees were subject to similar hazards—injuries caused by slips and falls in the work areas, by tripping over cords, and by falling off ladders. The hazards were not identical, but were similar. *Higgins,* 400 N.W.2d at 195.

O'Malley asserts that the risks for these two groups of employees were different. He asserts that Max Johnson employees were the only ones subjected to "live" traffic, while Ulland Brothers employees were not, and that only Ulland Brothers employees were subject to the risks of the hot mix plant and other equipment. The dissent believes that O'Malley has demonstrated that there is a factual dispute regarding whether the employees of Ulland Brothers and Max Johnson were subject to the same or similar hazards. However, the record contains the affidavits of supervisors of both companies at the project, and both state that all workers on the project were subject to risks of weather conditions, fire or explosion, collisions between

vehicles or between vehicles and people. The dissent also believes that the credibility of the affiants or the inferences to be drawn from their affidavits may constitute disputed facts. But our review of the record, including the affidavits, reveals no credibility dispute. The district court, in its review of the record on summary judgment, found no manifestation of a dispute regarding credibility. Nothing on the face of the affidavits indicates a lack of credibility, nor do the parties themselves challenge the credibility of the affiants.

We have previously determined that employees were not engaged in a common activity and experiencing the same or similar hazards in the context of summary judgment. *Kaiser,* 353 N.W.2d at 906. In this case also, review of the record, including the affidavits submitted to the district court with the summary judgment motion, permits us to determine that there is no material fact dispute with regard to whether the workers were experiencing the same or similar hazards. We conclude that these employees were subject to hazards which, while not identical, were sufficiently similar to satisfy the third factor of the *McCourtie* analysis.

Having concluded that all three of the *McCourtie* factors are met, we determine that Ulland Brothers and Max Johnson were engaged in a common enterprise. Therefore, under Minn.Stat. § 176.061, subds. 1 and 4, O'Malley's election of workers' compensation benefits from his employer precludes an additional action against Ulland Brothers for damages.

### III.

The parties also disagree on the proper application of the standard of review in this case. The summary judgment standard asks whether there is a genuine factual dispute for trial. Ulland Brothers agrees, for the purposes of this appeal and for the summary judgment motion, that all facts as stated by O'Malley are assumed to be true. There is therefore no direct factual dispute. However, O'Malley argues that, while there is no direct factual dispute, there is a dispute sufficient to survive summary judgment because different inferences could be drawn from the

facts, citing *Sauter v. Sauter,* 244 Minn. 482, 484–85, 70 N.W.2d 351, 353 (1955).

The moving party, Ulland Brothers and its employee, John Lee, have the burden of proving that there is no genuine issue as to any material fact, and that they are entitled to judgment as a matter of law. *Id.* All inferences must be drawn in favor of the nonmoving party. *Id.* "Since, however, all factual inferences must be drawn against the movant for summary judgment, it follows that, even where the movant's supporting documents are uncontradicted, they may in themselves be insufficient to sustain his burden of proof." *Id.* O'Malley asserts that different inferences may be drawn regarding whether there existed a "common project," whether the employees were "working together," and whether the employees were exposed to the "same hazards." Ulland Brothers replies that these questions are actually legal determinations, the application of the law to the undisputed facts, and thus proper subjects for summary judgment.

As noted above, application of a statute to a set of undisputed facts is a question of law, not binding on this court. *A.J. Chromy Constr.,* 260 N.W.2d at 582. Here, the statute is Minn.Stat. § 176.061, subds. 1 and 4—providing that an injured worker who collects workers' compensation benefits from his or her employer is precluded from also bringing an action against a third party, if the employer and the third party are engaged in "furtherance of a common enterprise." The application of this statute to an undisputed set of facts is a legal question, under *Chromy.* Whether the parties engaged in a "common project," whether the parties were "working together," and whether the employees were subject to the "same or similar hazards" are the factors of the *McCourtie* test to determine whether the parties acted in furtherance of a common enterprise pursuant to Minn.Stat. 176.061, subds. 1 and 4. *McCourtie,* 253 Minn. 501, 93 N.W.2d at 552.

A determination of whether a common enterprise existed is a legal determination, and not a factual inference. In this case, the movant, Ulland Brothers, offered as supporting documents excerpts of the depositions of O'Malley; Lee; Ulland Brothers superinten-

dent, Bruce Emerson; Max Johnson general manager, Gary Johnson; and Max Johnson employees, Charles Hager and Rodney Schramm. Any necessary factual inferences from these documents must be drawn in favor of O'Malley. A review of Ulland Brothers' documents submitted in support of the summary judgment motion and of the entire record, including all pleadings, does not reveal a question regarding a fact or a factual inference. Ulland Brothers has agreed, for summary judgment purposes, that all facts as set out by O'Malley are assumed to be true. Moreover, O'Malley has not articulated an inferential factual dispute other than the assertion above that the relevant concepts of "working together," "common project," and "same hazards" are factual inferences in dispute.

In *Schleicher*, 406 N.W.2d 311, we determined that a worker's employer and subcontractor were not engaged in a common enterprise as a matter of law, based on undisputed facts, in the context of summary judgment. We conclude that this matter as well is appropriate for review on summary judgment. The facts of this case, together with any necessary inferences from them, demonstrate no genuine issue of material fact for trial, and the question of whether a common enterprise existed is one of law, subject to de novo review.

Affirmed.

KEITH, C.J., and COYNE and PAGE, JJ., dissent.

COYNE, Justice (dissenting).

Ulland Brothers contracted with the State of Minnesota to resurface a portion of Interstate 90 near Stewartville, Minnesota, during the summer of 1991. Max Johnson Trucking, a subcontractor, provided loading and hauling services for the project. There were other subcontractors who provided such services as grading, concrete, tiling, and landscaping work.

At the beginning of the project, Ulland Brothers and certain subcontractors set up barricades and signs to warn and detour traffic. A lane switch was also constructed to move traffic from the lanes to be repaired.

Then the old roadway surface was removed and hauled away by subcontractors using "demolition trucks." Next, Ulland Brothers dug a trench in the median of the highway, another subcontractor installed pipe, and Ulland Brothers buried the pipe.

The next stage of the project involved the location, excavation, and refilling of "soft" spots or areas, called "subcuts," where the base of the highway needed to be restored. Ulland Brothers employees removed the soil from these areas and loaded it into Max Johnson's trucks, which, in turn, hauled the material to a nearby pit. Max Johnson trucks also hauled the fill material, usually sugar sand, in "belly-dump" trucks to the excavated parts of the road. Ulland Brothers workers would direct the location for the delivery of the material and then grade the surface after Max Johnson drivers had delivered the sand. Frequently, Max Johnson's belly-dump trucks would become stuck in the soft sand, and Ulland Brothers workers would use Ulland Brothers equipment to push the trucks out of the sand.

On July 2, 1991, while delivering sand to a subcut site, a Max Johnson belly-dump truck, operated by Michael O'Malley, became stuck in the sand. To help free the Max Johnson truck, John Lee, an employee of Ulland Brothers, decided to push the truck with his road grader. When the grader came in contact with the Max Johnson belly-dump truck, O'Malley sustained an injury to his neck. O'Malley received workers' compensation benefits from his employer, Max Johnson.

O'Malley then brought a third-party action against Ulland Brothers and John Lee, who in turn joined Max Johnson as a third-party defendant. Ulland Brothers brought a motion for summary judgment, Max Johnson joined in the motion, and the trial court granted both Ulland Brothers and Max Johnson summary judgment. On appeal the court of appeals affirmed:

> Where an injured worker's employer and a negligent worker's employer were engaged in the same project, and the injured employee and the negligent employee were working together in such a fashion that they were subject to similar hazards, the two employers were engaged in a com-

mon enterprise. Because the injured worker elected to receive workers' compensation benefits, he is barred from pursuing a common law negligence action against the negligent worker and the negligent worker's employer under Minn.Stat. § 176.061 (1990).

*O'Malley v. Ulland Brothers,* 529 N.W.2d 735, 736 (Minn.App.1995).

On the limited record before us and in view of the construction consistently accorded section 176.061 by this court for more than 50 years, the characterization of their relationship by the two defendants and the third-party defendant as a common enterprise cannot, in my opinion, be unqualifiedly accepted as establishing, as a matter of law, the existence of a common enterprise between Ulland Brothers and Max Johnson.

The history of section 176.061 and this court's interpretation of "common enterprise," as that term is employed in section 176.061, is itself rather interesting. Prior to 1913 an employee had a common law action against a tortfeasor who was not his employer, but the workmen's compensation act, as it was enacted in 1913, took that action from the employee. The 1923 amendment to the act, codified as § 4291, Mason's Minn. St.1923, which is now Minn.Stat. § 176.601 (1994), restored that common law action to the employee, at least in part. In *Tevoght v. Polson,* 205 Minn. 252, 254, 285 N.W. 893, 894 (1939), this court commented on the reasons for the difficulties it encountered in interpreting and applying the third-party liability amendment:

No other state has such a provision as that incorporated in this amendment, and it was left to this court to interpret its provisions, which especially in the case of subd. (b) are rather vague and uncertain.

Initially, this court construed the "common enterprise" provision of the 1923 statute in such an expansive way that a mining company and an independent contractor with whom it contracted to construct a ditch and water line were held to be engaged in the accomplishment of related purposes within the meaning of the act. *Uotila v. Oliver Iron Mining Co.,* 165 Minn. 475, 478, 206 N.W. 937, 939 (1926). Similarly, in *Rasmussen v.*

*George Benz & Sons,* 168 Minn. 319, 210 N.W. 75 (1926), an iceman injured while delivering ice to a hotel was denied a common law action against the owner of the building, whose negligent maintenance of the elevator and stairway caused his injury:

Business is related when the parties are mutually or reciprocally interested in a commercial way; or where the business of one has a necessary relation toward or in conjunction with the other.

*Id.* at 324, 210 N.W. at 77. *See also McGrath v. Northwestern Trust Co.,* 178 Minn. 47, 225 N.W. 901 (1929).

Although other cases, such as *Horgen v. Franklin Co–Op. Creamery Ass'n,* 195 Minn. 159, 262 N.W. 149 (1935), and *Gentle v. Northern States Power Co.,* 213 Minn. 231, 6 N.W.2d 361 (1942), signalled a retreat from the court's early view of the 1923 amendment, *Gleason v. Geary,* 214 Minn. 499, 8 N.W.2d 808 (1943), marked an about-face with respect to the meaning of "common enterprise."

Justice Julius J. Olson, writing for the court in *Gleason,* had this to say about the third-party liability section of the compensation act:

Unquestionably the legislative purpose was to enlarge the rights and remedies of the injured workman. His employer, under the original act, was well taken care of, and these rights under the second subdivision of the amended act were retained for him. He has lost nothing by the change. Since it was the injured workman the legislature sought to help, we should now say without equivocation that * * * the legislature "intended that his common-law right of action should only be eliminated in situations like those where" several employers "are engaged on the same project and their employees exposed to the [same or similar] hazards created by such mutual engagements." [Quoting *Tevoght v. Polson,* 205 Minn. 252, 254, 285 N.W. 893, 894 (1939).]

214 Minn. at 508, 8 N.W.2d at 812.

Subsequently, *Swanson v. J.L. Shiely Co.,* 234 Minn. 548, 560, 48 N.W.2d 848, 852 (1951), explicitly overruled the holding that a

buyer and seller were engaged in a common enterprise when the seller delivered the merchandise but, as Arthur Larson puts it, in *Shiely* the court "launched a new rule just as restrictive as the former was expansive."[1] In *Shiely* the employers of the injured man and both tortfeasors were all engaged in the construction of an addition to a warehouse. The injured worker's employer was engaged to remove overhead doors at one end of the existing warehouse. Shiely had an order from the general contractor, who was laying a concrete floor in the addition, to deliver ready-mixed concrete to be emptied onto any spot where the general contractor wanted to use it. When the Shiely driver arrived at the warehouse with his fourth load of concrete on the day in question, he discovered that the general contractor's foreman had changed the routing of the ready-mixed trucks. The driver drove to the spot designated by the foreman, who then walked near the left rear wheel and directed the driver in backing up his truck to the place where he was to drop the load of concrete. The right rear portion of the truck struck the plaintiff's ladder, causing him to fall about 14 feet. There was ample evidence to support the jury's findings of negligence and proximate cause, but the defendants contended that all the parties were engaged in furtherance of a common enterprise. Affirming the order denying the defendants' post trial motions, this court held that Shiely was not engaged in a common enterprise or related purpose with either the general contractor or the company that removed the overhead doors. Therefore, both Shiely and the general contractor were subject to third-party liability to the injured workman. *Id.* at 560, 48 N.W.2d at 855.

Two years later, in *Crawford v. Woodrich Construction Co.*, 239 Minn. 12, 57 N.W.2d 648 (1953), this court said that the common enterprise provision "should be *interpreted and actually applied* as if it in fact read as follows:

'The provisions of subdivision 1 of this section shall apply only where the employer liable for compensation and the other party or parties legally liable for damages were both either insured or self-insured and were engaged in the due course of business,' *on the same project, and their employees were working together in the performance of such project in a manner which exposed them to the same or similar hazards* on the premises where the injury was received and at the time thereof, and not otherwise."

*Id.* at 20, 57 N.W.2d at 653 (italics in the original). The court went on to say "that the statutory phrases 'common enterprise' and the 'accomplishment of the same or related purposes' no longer have an independent significance and that, in recognition of the legislative intent, *they have been wholly superseded by, and have been merged in, a new rule born of statutory construction.*" *Id.* In *Crawford*, an inspector employed by the state was run over by a cement truck while inspecting the forms into which the concrete was to be poured. It was held that the inspector was not barred from prosecuting a common law action against the construction company.

In *Urbanski v. Merchants Motor Freight*, 239 Minn. 63, 57 N.W.2d 686 (1953), the court held, in reliance on *Crawford*, that a member of a manufacturer's loading dock crew who was injured while helping a third party who delivered merchandise to the employer-manufacturer was not limited to recovery under the act: "Not every contact between an employer and a third party in the course of conducting their separate businesses constitutes engagement by them on the same project. * * * It is sufficient for the purposes of this decision to state that one who delivers merchandise to a manufacturer is not engaged with the manufacturer on the same project even though they join, through their employees, in unloading the merchandise from the delivery truck." 239 Minn. at 71, 57 N.W.2d at 690–91.

A few years later, in *McCourtie v. United States Steel Corp.*, 253 Minn. 501, 506, 93 N.W.2d 552, 556 (1958), the court set out the following requirements for application of the common enterprise rule:

(1) The employers must be engaged on the same project;

---

**1.** 2A Larson, Workmen's Compensation § 72.34, 14–290.10 (1995).

(2) The employees must be *working together* (common activity); and

(3) In such fashion that they are subject to the same or similar hazards.

This interpretation of the statute emphasizes the *common activities of the employees* as opposed to the *common activities of the employers* and has been consistently followed by this court since Gentle v. Northern States Power Co., 213 Minn. 231, 6 N.W.2d 361 [emphasis in original].

The court went on to say this about the common activities of the employees:

> In light of the history of the statute, its purpose and policy are served only when the employees of different employers are engaged in a common activity. Before such common activity can be said to exist there must be work in which both sets of employees participate, such as in the *Gleason* case where the employees of the hatchery owner and the contractor worked together in the pouring of cement and laying of a concrete floor or in the *Volding* [2] case where employees of both employers were working together in preparation of the opening of a store. Where however two employers perform different types of work, such as steel construction work and plumbing, and where the performance of these jobs is not related except in a vague, general way looking toward the completion of a structure, and where the activities of the two sets of employees have nothing in common and do not share or join in any of the work between themselves, it cannot be said that the employees are within the "common activities of the employees test" of the *Gentle* and *Gleason* cases.

*Id.* at 510, 93 N.W.2d at 559.

In *McCourtie,* this court held that the evidence supported the findings of a jury that a plumbing subcontractor and an employee of a steel construction subcontractor, both of whom were working on the same project, were not engaged in a common enterprise. Although the differences in the kind of work that a plumber and a steel construction worker do may be more obvious than the differences between the work of a truck driver and a highway construction worker, there *are* differences of such significance that it cannot be said that as a matter of law the employers were engaged in a common enterprise. That the *McCourtie* court viewed the common enterprise provision as limiting recovery from a negligent third party in only those rare cases in which " 'the masters have joined forces and in effect have put the servants into a common pool' " [3] is apparent when one reviews the circumstances in which McCourtie was injured.

At the time of the accident McCourtie was installing plumbing on the ground level of a taconite plant under construction. About 60 percent of the steelwork had been completed and at the time of the accident a group of steelworkers was installing girts on the outside walls of part of the building. A crane was used to lift the girts to the spot where they were needed so that they could be bolted in place. When the existing superstructure prevented the crane from placing the girts where they were needed, the girts were raised by the crane in bundles, pushed as far as possible toward the place where they were to be used and landed on steel beams. While a bundle of 12 pieces of steel was being raised, it struck a part of the structure, causing 8 of the 12 pieces to slide out of the bundle and ricochet down through the steel skeleton of the building. When the pieces started to fall, a steelworker yelled "headache," an expression used in the industry to warn those below that something was falling. Apparently McCourtie understood the warning because he attempted to get away but was struck by a piece of steel that weighed

---

**2.** In *Volding v. Harnish,* 236 Minn. 71, 80–81, 51 N.W.2d 658, 663–64 (1952), a finding of fact that a franchiser and franchisee whose employees worked together to select and arrange merchandise in preparation for the grand opening of a franchised store was affirmed, limiting the employee's recovery to the amount provided by the workmen's compensation act.

**3.** *McCourtie v. United States Steel Corp.,* 253 Minn. 501, 509, 93 N.W.2d 552, 558 (1958), quoting *Gleason,* 214 Minn. at 511, 8 N.W.2d at 814.

more than 175 pounds and severely injured. Several steelworkers sought shelter under or near beams or any place they could find protection from the falling steel, and it appears that McCourtie was the only person injured.

Some 15 years later, in reliance on *McCourtie,* this court in *Kaiser v. Northern States Power Co.,* 353 N.W.2d 899, 906 (Minn.1984), affirmed the trial court's determination that city firefighters and employees of a natural gas company were not engaged in a common enterprise even though both had a common goal of containing a fire that followed a gas explosion at the Commodore Hotel. Each had "distinct functions to perform" and the firefighters encountered greater risks than the gas company personnel. Finally, in *Schleicher v. Lunda Constr. Co.,* 406 N.W.2d 311 (Minn.1987), this court affirmed the court of appeals' conclusion that the delivery driver of the subcontractor who supplied concrete to a bridge construction project and the employee of another subcontractor who ran a hopper-conveyor system that received the concrete and transported it along the bridge deck to the placing and finishing crew were not engaged in a common enterprise. In so holding, this court rejected the following common activity claim:

> Advance argues that it was all one coordinated activity. The Cemstone concrete and drivers, the Advance hopper-conveyor system, and the Lunda placing and finishing crew all had to be available at the same time. Concrete was delivered to the site and spread directly into place. If it was delivered too slowly, an Advance employee would pitch in and help expedite the unloading. All this, Advance argues, points to a common activity. However, the duties of the delivery crew and of the conveyor and finishing crews overlapped minimally and were not interdependent except in the general way that construction work depends on delivery.

*Id.* at 313–14.

In the present case the majority looks to Minn.Stat. § 176.001 to justify its reliance on *McCourtie* to support its interpretation of the facts presented in connection with the motion for summary judgment. In so doing,

the majority trudges in the footsteps of the court of appeals, which relied on section 176.001 when it rather cavalierly distinguished *Schleicher* in these words:

> It is clear that Max Johnson's primary job was to deliver materials between the job sites. In practice, however, Max Johnson employees had more than just incidental contacts with Ulland Brothers employees, as when Ulland Brothers grader operators assisted Max Johnson trucks stuck in the sand. The completion of the construction project was facilitated by interrelated and coordinated steps involving both Ulland Brothers and Max Johnson employees. Thus, to an extent the work of Ulland Brothers and Max Johnson employees was interdependent in more than just the general way that construction work depends on delivery. *See Schleicher,* 406 N.W.2d at 313–14.

*O'Malley,* 529 N.W.2d at 739. Here the plaintiff and his employer were engaged to pick up and haul away the material excavated from the subcuts and to deliver sand so that Ulland Brothers could refill and pave them. A fair reading of the record reflects that the work done by Ulland Brothers employees and Max Johnson employees was no more and no less interdependent than the "coordinated" paving work done in *Schleicher.* While it is also fair to say that *O'Malley* is not the "pure" delivery situation, it also is not a case in which—at least as a matter of law—it can be said that " 'the masters have joined forces and in effect have put the servants into a common pool.' " *McCourtie,* 253 Minn. at 509, 93 N.W.2d at 558, quoting *Gleason,* 214 Minn. at 511, 8 N.W.2d at 814. It must be conceded that McCourtie, who tried but could not get out from under the falling beam, and the steelworkers who found protection under beams were also exposed to some of the same hazards. Nevertheless, in *McCourtie,* this court paid respect to the rule of statutory construction that a person is not to be deprived of his common law rights unless the intention to do so is clearly expressed in the act and concluded that the evidence supported the finding by the jury that the plaintiff and the defendant's employ-

ees were not exposed to the same or similar risks at the time and place of the injury.

What both the court of appeals and the majority have blithely snubbed is that, at best, the question whether the employers were engaged in a common enterprise within the meaning of section 176.061, subdivisions 1 and 4 is a mixed question of law and fact. In response to the defendants' and third-party defendant's motions for summary judgment the plaintiff has provided enough evidence that the workers of the two employers were not subject to the same or similar hazards that a finder of fact, taking into consideration the credibility of the various affiants and the inferences fairly to be drawn from the affidavits, could conclude that the two employers were not engaged in a common enterprise within the purview of section 176.061, subdivisions 1 and 4. On the record before us, it seems to me that one simply cannot say that the facts are undisputed. It is, of course, in the defendants' interest to infer from the facts they present that the employers were joined in a coordinated activity and that their employees were subject to the same hazards, but the inferences to be drawn from the facts and the credibility of the affiants are matters in the exclusive province of the finder of fact. *Conroy v. Kleinman Realty Co.*, 288 Minn. 61, 65–66, 179 N.W.2d 162, 165–66 (1970).

Candor compels the admission that even though *Gleason v. Geary, supra*, seemed to me a well-considered withdrawal from an extremely inclusive interpretation of the "common enterprise" provision, from the day the opinion issued in the *McCourtie* case to the present I have regarded it as an ill-advised leap to the opposite extreme of narrowness. Nevertheless, any practitioner in

the field of workers' compensation understood full well that for all practical purposes "common enterprise" was no longer a viable defense against third-party liability. And if there was a practitioner who clung to the hope that coordination of the work of various prime and subcontractors, their employees and their equipment on a construction project could be parlayed into a "common enterprise," he was surely disabused of that notion by the 1987 decision in *Schleicher.*

In short, it has been nearly 50 years since this court has held that an employee was precluded by the "common enterprise" provision from maintaining a common law action against any third-party tortfeasor.[4] When, in *McCourtie*, the court announced that it is only when the employees are engaged in common activities that expose them to the same or similar hazards that the statutory "common enterprise" provision may be invoked and when the court stated "we must respect the rule of statutory construction that a person is not to be deprived of his common-law rights unless the intention to do so is clearly expressed in the act," [5] the court was serving notice that any change in the construction or application of the statutory provision with respect to third-party liability awaited legislative intervention. Since then the legislature has indeed intervened; in 1969 the legislature adopted a provision which encourages employee actions to impose third party liability by awarding to the employee the first one-third of the proceeds remaining after deducting the costs of collection. [Act of April 25, 1969, ch. 199, § 2, 169 Minn. Laws 307, 309.]

It may be that public policy would be better served by according immunity to com-

**4.** In *Peterson v. Little–Giant*, 366 N.W.2d 111, 116 (Minn.1985), the parties to the appeal both conceded that the plaintiff's employer and the defendant-appellant were engaged in a "common enterprise" and that defendant-appellant was, therefore, immune from suit in tort. *But see Peterson v. Kludt*, 317 N.W.2d 43, 48 (Minn. 1982), in which the court said that an employee could not sue a co-employee for injuries sustained when they were engaged in a "common enterprise." The result was clearly right, but for the wrong reason. *See* Minn.Stat. § 176.061, subd. 5 (1978), amended to clarify that workers' compensation act was never intended to shift tort

liability from employer to fellow employee. *See also* Minnesota Workers' Compensation Study Commission, *A Report to the Minnesota Legislature and Governor* 41 (1979); Act of June 7, 1979, ch. 3 § 31, 1979 Minn. Laws Ex.Sess. 1256, 1272.

**5.** *McCourtie*, 253 Minn. at 510, 93 N.W.2d at 558. Professor Arthur Larson characterizes "forgetting the pervading rule that valuable common-law rights shall not be deemed destroyed by a statute except by clear language" as a "cardinal sin." 2A Larson, Workmen's Compensation § 72.34, 14–290.7 (1995).

mon-law liability to any contractor or subcontractor who is subject to liability for the payment of all compensation due the employee of an uninsured subcontractor pursuant to Minn.Stat. § 176.215 (1994), but it is for the legislature to change the purely statutory structure of the workers' compensation, and it seems to me presumptuous for this court to alter a statutory construction of which the legislature has tacitly approved for more than 50 years.

I would reverse the decision of the court of appeals and remand the matter to the district court for further proceedings.

KEITH, Chief Justice (dissenting).

I join the dissent of Justice Coyne.

PAGE, Justice (dissenting).

I join the dissent of Justice Coyne.