*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1751**

Jessica Kelly,
as Trustee for the heirs and next-of-kin of
Richard Roy Washburn, Deceased,
Respondent,

vs.

Kraemer Construction, Inc.,
Appellant.

**Filed July 25, 2016
Reversed and remanded
Rodenberg, Judge
Dissenting, Bratvold, Judge**

St. Louis County District Court
File No. 69DU-CV-14-2794

Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, Minnesota (for respondent)

Timothy R. Murphy, Cara C. Passaro, Murphy & Passaro, PA, Mendota Heights, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Rodenberg, Judge; and Bratvold, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

Appellant Kraemer Construction appeals the denial of its motion for summary judgment in a wrongful-death action based on negligence. We conclude that, even viewing

the evidence in the light most favorable to the trustee for the heirs and next-of-kin of decedent, appellant and the decedent's employer were engaged in a common enterprise at the time of the accident. We therefore reverse and remand for the entry of summary judgment dismissing all claims against Kraemer.

## FACTS

Richard Washburn was killed by electrocution on October 4, 2012 while on the job as an employee of Ulland Brothers, Inc. Respondent Jessica Kelly, the mother of Washburn's two minor children, collects workers' compensation benefits through Ulland on behalf of the children. In this suit, Kelly, as trustee for Washburn's heirs and next-of-kin and respondent in this appeal, seeks tort damages for Washburn's death arising from the negligence of Kraemer.

On the day Washburn was killed, he was working with others along County Road 23, just north of Highway 210 in the City of Wright, Carlton County, Minnesota. Washburn's employer, Ulland, is a general contractor and had sub-contracted with Kraemer to replace deteriorated steel culverts that allowed a roadway to go over a stream. The job required a crane to lift and lower two cement culverts into the streambed. Kraemer supplied a crane and two workers. Ulland supplied the rigging and four workers.

The district court summarized the undisputed evidence about who did what, as follows:

> Each man had a specific job: Terry Rassier [Ulland] operated a bulldozer that would push the culverts to a place so that the crane could pick them up; Rick Washburn [Ulland] would manually guide the culvert boxes while they were lowered; Jeremy Wright [Ulland] would rig the crane cable to the culvert

2

prior to them being lifted and then once set he would go inside the culverts and connect the two culvert sections together; Matt Kisley [Ulland] assisted Jeremy Wright in connecting the culvert pieces; Mike Bergstrom [Kraemer] operated the crane; and Roger Poukka [Kraemer] was Mr. Bergstrom's oiler, essentially a signaler from the ground to ensure accuracy and safety of the culverts placements.

Workers from both crews testified that, although the assignment of tasks and responsibilities was clear, they would assist one another as needed. For example, Poukka (Kraemer) helped to maneuver the culverts as they were lowered into place and Washburn (Ulland) gave instructions to Bergstrom (Kraemer) as he operated the crane.

The crew discussed the danger posed by the proximity to the crane of an overhead power line. Early in the morning, before the first culvert was placed, Ulland employees measured a safe zone and marked an appropriate location for the crane to park for placement of the first culvert. The Kraemer crane operator, Bergstrom, double-checked and approved the measurements and markings. Later in the day, Bergstrom worked with the second Kraemer employee, Poukka, to re-park the crane for placement of the second culvert, approximately mirroring the parking location for the first culvert but without measuring or marking the ground.

The parties agree that a crane's boom and cable should generally stay at least ten feet away from power lines, because electricity can arc through the air from one conductor to another under certain conditions, and because power lines can swing in the wind. There was misty rain and wind at the time of the accident.

The first culvert was placed without incident. As the second culvert was being placed, Washburn grabbed it with his hands to maneuver it, and was electrocuted. The

3

crew administered CPR and called for an emergency vehicle, but Washburn passed away within minutes. Poukka also felt a shock as he briefly touched the culvert, but he was not seriously injured.

During this litigation, Ulland and Kraemer employees testified that no part of the crane touched the power lines, but that the crane cable was about five to eight feet away from the power lines at the time Washburn was electrocuted. The record evidence indicates that either electricity arced from the power line into the crane's cable, or the power lines came into momentary direct contact with the cable due to wind and then electricity traveled down the cable into the cement culvert.

Kraemer moved for summary judgment, claiming that the district court lacked subject-matter jurisdiction under the Workers' Compensation Act and the common-enterprise doctrine. The district court denied Kraemer's motion for summary judgment, concluding that genuine issues of material fact existed concerning the applicability of the common-enterprise doctrine. This appeal followed.

**D E C I S I O N**

**I. Appeal`ability and standard of review**

Generally, an order that denies a motion for summary judgment is not appealable unless the district court has certified that the question presented is important and doubtful. Minn. R. Civ. App. P. 103.03. Here, the district court denied Kraemer's motion to certify the question. But "an order denying summary judgment in an employee's negligence action is immediately appealable when dismissal is sought based on the district court's lack of subject matter jurisdiction." *McGowan v. Our Savior's Lutheran Church*, 527 N.W.2d

4

830, 831-32 (Minn. 1995). "Where the [Workers' Compensation] Act provides the employee's exclusive remedy, the district courts have no jurisdiction." *Id.* at 833. Because Kraemer seeks dismissal of the suit for want of subject-matter jurisdiction, the district court's order denying summary judgment is immediately appealable.

We review summary-judgment decisions de novo. *LeDoux v. M.A. Mortenson Co.*, 835 N.W.2d 20, 22 (Minn. App. 2013). We determine whether any genuine issues of material fact exist and whether the district court erred in applying the law. *Mumm v. Mornson*, 708 N.W.2d 475, 481 (Minn. 2006). "A fact is material if it affects the outcome of the case." *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 40 (Minn. App. 2009). In determining which facts are "material" for summary judgment, we are mindful that "[t]he common enterprise test focuses on the activities of the workers, rather than the common goals of the employers . . . ." *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 895 (Minn. 1996). We view the evidence in the light most favorable to the party opposing summary judgment. *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 564 (Minn. 2008). Here, we view the evidence in the light most favorable to Kelly.

## II. Common-enterprise test

Under the Workers' Compensation Act, an injured employee (or the representative of a deceased employee) may seek workers' compensation benefits from the employer *or* sue a third party for damages, but not both, if the employer and the third party were engaged "in the due course of business in . . . furtherance of a common enterprise" at the time of the injury. Minn. Stat. § 176.061, subds. 1, 4 (2014); *LeDoux,* 835 N.W.2d at 22. Two employers are engaged in a "common enterprise" when (1) they are working on the same

5

project, (2) their employees are "working together on a common activity," *and* (3) their employees are "exposed to the same or similar hazards." *LeDoux*, 835 N.W.2d at 22 (citing *McCourtie v. U.S. Steel Corp.*, 253 Minn. 501, 506, 93 N.W.2d 552, 556 (Minn. 1958)).

The issue is whether Kraemer and Ulland were engaged in a common enterprise at the time of Washburn's death. If the two employers were engaged in a common enterprise, the Workers' Compensation Act is the exclusive remedy because Kelly has collected workers' compensation benefits. Under the first factor of the three-part test, the parties agree that the two crews were working on the "same project." The parties disagree about the other two factors.

*"Working together on a common activity"*

Respondent's principal argument on appeal is that there is a genuine issue of material fact concerning the common-activity factor. The common-activity factor is satisfied where "[i]t was not only contemplated that [two groups of employees] would work together, [but that] it was essential to avoid chaos at the site." *O'Malley*, 549 N.W.2d at 896. "To be common, the employees' activities must not merely overlap minimally, they must be 'interdependent.'" *LeDoux*, 835 N.W.2d at 23 (quoting *O'Malley*, 549 N.W.2d at 895). "The test emphasizes the common activities of the workers rather than the common goals of the employers." *Schleicher v. Lunda Constr. Co.*, 406 N.W.2d 311, 313 (Minn. 1987).

For example, we have held that two groups of employees who independently contribute to "building of a structure" do not satisfy the common-activity prong. *LeDoux*, 835 N.W.2d at 23 (reversing summary judgment on the common-enterprise doctrine where

two groups of employees worked on different parts of a building, did not know each other's names, and did not help each other). On the other hand, the Minnesota Supreme Court has held that the employers of a dump-truck driver and a road-grader driver were engaged in a common activity when one rear-ended the other at the site of a shared road-repair project. *O'Malley*, 549 N.W.2d at 895-96 (affirming summary judgment where two groups of employees exchanged equipment, sought advice from each other's supervisors, and worked interdependently on specific tasks throughout a summer-long project).

Here, the district court concluded that it could not "definitively rule that the parties were engaged in a common activity," and that "there is a question of fact as to whether or not the Ulland employees were even necessary for the Kraemer employees to perform the crane work and vice versa." The district court added that, "perhaps," if Poukka had remained exclusively focused on his assigned task of directing the crane operator, the accident could have been avoided.[1]

The common-activity factor ignores volunteer acts in determining whether the two crews' work was interdependent. *See Carstens v. Mayers, Inc.*, 574 N.W.2d 733, 736 (Minn. App. 1998) (holding that a "favor or an accommodation" between two groups of employees does not affect the common-activity analysis), *review denied* (Minn. Mar. 26, 1998). Poukka assisted in maneuvering the culverts into place on a volunteer basis; similarly, any signaling to Bergstrom by Ulland employees would have been voluntary.

---

[1] The district court seemed concerned that, had Poukka been more diligent in attending to his assigned tasks, "perhaps" the accident would not have happened. But there is no authority for the notion that the common-enterprise question depends upon fault.

7

The common-activity factor considers whether Kraemer's task of operating and directing the crane was interdependent with Ulland's task of the maneuvering and placing the culverts.

Based on this record, the two crews could not have accomplished the project by working separately. For many hours, the two crews worked together to lift and place one and then a second culvert. The two crews needed each other and did not merely work side-by-side; they worked simultaneously and in close coordination to complete the project.

During his deposition, Ulland's foreman Terry Rassier testified that the two crews had a meeting in the morning on the day of the accident to plan the sequence of tasks and events. In fact, Rassier explained that Ulland did not own any piece of machinery large enough to lift the culverts, so Ulland counted on Kraemer to provide the crane and employees to operate it. And, by all accounts, Ulland supplied the "rigging equipment" used during the work.[2] Also during Rassier's deposition, the following exchange occurred:

> Q: In setting the pipe on the north side and the south side and accomplishing that goal for the day, you needed the Kraemer guys and you needed your guys and you needed the two crews working together to get the goal accomplished, correct?
>
> A: Yes, always.

Not only was their working together "essential to avoid[ing] chaos at the site," *see O'Malley*, 549 N.W.2d at 896, it was essential to completing the project. Bergstrom agreed

---

[2] Poukka (employed by Kraemer) so testified, and the record, on our de novo review, reveals no contrary evidence. Jeremy Wright (employed by Ulland) assisted with rigging. Poukka testified that he "would have stopped [Wright] if there was something wrong with" the way Wright was assisting with the rigging. De-rigging was done by Ulland and Kraemer employees working together.

in his deposition testimony that the employees of Ulland and Kraemer were "working together towards the common goal of completing this culvert project." The record establishes that the two groups worked simultaneously and interdependently "in a common activity." *See McCourtie*, 253 Minn. at 506, 93 N.W.2d at 556. There is no genuine issue of material fact concerning this second factor.

*"Subject to the same or similar hazards"*

"The same or similar hazards requirement does not demand exposure to identical hazards, only similar hazards." *Olson v. Lyrek*, 582 N.W.2d 582, 584 (Minn. App. 1998), *review denied* (Minn. Oct. 20, 1998). In analyzing this factor, we compare the "general risks" to which workers are exposed as a result of the tasks they are performing. *Id.* We have previously held that two workers were exposed to similar hazards where a steel worker directed a crane operator and connected the beams he moved, and the steel worker was struck by a crane boom. *Ritter v. M.A. Mortenson Co.*, 352 N.W.2d 110, 113 (Minn. App. 1984) (affirming summary judgment and concluding that pooled crewmembers "were subject to the same or similar hazards of the job, such as falling beams, electrical shock, injury from the crane, etc.").

The district court "conceded that it is arguable" that Poukka and the Ulland employees shared risks but that "electrocution was not one of them." Noting that Poukka received "a small jolt," the district court nonetheless concluded that the risk of electrocution could only be attributed "legitimately" to Washburn. Respondent argues on appeal that Poukka was exposed to the risk of electrocution, but only as a "volunteer." We review the same-or-similar-risks factor de novo.

9

This third factor does not isolate a particular hazard, not even the particular hazard that came to fruition. Rather, the proper comparison is of the "general risks to which workers are exposed as a result of the tasks being performed." *Olson*, 582 N.W.2d at 584; *see also O'Malley*, 549 N.W.2d at 896-97.

Kraemer offered the only expert evidence on summary judgment regarding general risks, and established that the Ulland and Kraemer employees shared the risks of injury from suspended or falling objects, being struck by the crane or the bulldozer, falling or slipping in the wet streambed or surrounding area, or from maneuvering the rigging or other heavy equipment.

Electrocution was also a shared risk.[3] Indeed, the whole crew participated in precautionary efforts to mitigate the risk of electrocution. Poukka was shocked as he touched the second culvert being cooperatively lowered into place. Respondent argues that Poukka's "volunteering" to guide the culvert into place has relevance to the common-hazards analysis, but cites no authority for this assertion, and we are aware of none. The volunteer status of a worker bears on the common-activity factor. *Carstens*, 574 N.W.2d at 736. Moreover, and even if Poukka had not placed his hand on the culvert, he was exposed to a general risk of electrocution by arcing, falling wires, or contact with

---

[3] Respondent's expert affidavit analyzed only the risk of electrocution. After noting that a safe working distance from the power lines was ten feet, the affiant concluded that "*all of the people onsite*, including the crane operator and signalman employed by Kraemer Construction, readily admitted that they were working within a range of five to eight feet away from the power lines." (Emphasis added.) In other words, respondent's expert opinion concurs with appellant's evidence that all workers of both employers were exposed to the risk of electrocution.

10

the crane.  The two crews specifically discussed and employed measures to minimize the risk of electrocution to all of the workers.  And even if Bergstrom was safe from electrocution while he was inside the cab of the crane, his insulation from that particular risk would have no bearing on whether the two crews shared similar "general risks."  *See Olson*, 582 N.W.2d at 584.  While Bergstrom's individual exposure to the general risks is distinguishable in some ways from the risks to which others were exposed, there is no genuine issue of material fact concerning whether the two crews were "subject to . . . similar hazards."  *See McCourtie*, 253 Minn. at 506, 93 N.W.2d at 556.  The two crews were subject to similar, if not identical, hazards at the worksite.

Finally, the statute that underlies the *McCourtie* test provides that a court must determine whether the two crews were engaged in a "common enterprise."  *See* Minn. Stat. § 176.061, subds. 1, 4.  The task for the day was to lift and place the culverts.  No genuine issues of fact affect the legal conclusion that the Ulland and Kraemer crews were engaged in a common enterprise.  We reverse and remand for entry of summary judgment in favor of Kraemer.

**Reversed and remanded.**

**BRATVOLD**, Judge (dissenting)

I respectfully dissent. While I concur with the majority's view of the same-project and common-activity factors, I conclude there is a question of fact regarding the similar-hazard factor. As a result, I would affirm and remand for trial. Because the record establishes that (a) the crane spotter would not have been exposed to the hazard of electrocution if he had performed his assigned task of directing the crane operator and (b) the crane operator was never exposed to the risk of electrocution, I agree with the district court that the common-enterprise doctrine does not bar this claim at the summary-judgment stage. Additionally, as the district court noted, if the crane spotter had strictly focused on his assigned task, the evidence supports the inference that he may have prevented the harm to Washburn. This is sufficient to defeat summary judgment.

This court examines general risks in the context of the specific tasks involved. *Olson v. Lyrek*, 582 N.W.2d 582, 584 (Minn. App. 1998), *review denied* (Minn. Oct. 20, 1998). Under that analysis, we have previously held that two workers from different crews who were both injured by the same event did *not* satisfy the similar hazards factor. *Id.* (affirming denial of defendant's motion for summary judgment on a common-enterprise theory where a backhoe driver was thrown from the cab and a worker in the trench below was pinned as the backhoe accidentally lurched backward into the trench); *see also Sorenson v. Visser*, 558 N.W.2d 773, 776 (Minn. App. 1997) (affirming district court decision that electrician and backhoe operator faced different hazards although working on common activity to excavate trench). Based on our caselaw and the specific task in this case, I believe we must

carefully consider the evidence regarding general hazards as well as the risk of electrocution.

Six workers were engaged in the same project and common activity. Three Ulland employees, including the decedent, were exposed to the risk of electrocution. It is undisputed that two workers from different employers were *not* exposed to the risk of electrocution while they remained in their cabs and performed their assigned tasks—the crane operator (Kraemer) and the bulldozer operator (Ulland). While the crane spotter (Kraemer) felt a jolt of electricity (sharing a "same or similar hazard" with the decedent), this was because he volunteered to help guide the culvert.

On this evidence, reasonable minds may disagree whether these workers were exposed to the same or similar hazards. Because this is a close case giving rise to conflicting inferences, the jury should determine whether the Kraemer employees were subject to a hazard similar to the Ulland employees.