Jessica KELLY, as Trustee FOR the heirs and next-of-kin of Richard Roy WASHBURN, Deceased, Appellant,

v.

KRAEMER CONSTRUCTION, INC., Respondent.

A15-1751

Supreme Court of Minnesota.

Filed: June 7, 2017

■■■■■■■■

Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, Minnesota, for appellant.

Timothy R. Murphy, Cara C. Passaro, Murphy & Passaro, PA, North Oaks, Minnesota, for respondent.

## OPINION

CHUTICH, Justice.

Appellant Jessica Kelly, as trustee for the next-of-kin of Richard Washburn, sued respondent Kraemer Construction, Inc. (Kraemer), alleging that Kraemer's negligence caused Washburn's death by electrocution at a construction site. Kraemer moved for summary judgment, arguing that it was engaged in a common enterprise with Washburn's employer, Ulland Brothers, Inc. (Ulland), and that the election-of-remedies provision of the Minnesota Workers' Compensation Act requires dismissal of Kelly's suit. *See* Minn. Stat. § 176.061 (2016). The district court denied summary judgment. A divided panel of the court of appeals reversed the district court's decision and remanded for entry of summary judgment in favor of Kraemer. *Kelly v. Kraemer Constr., Inc.*, No. A15-1751, 2016 WL 3961817, at *5 (Minn. App. July 25, 2016). Kelly appeals, arguing that a genuine issue of material fact precludes summary judgment. Because we hold that Kraemer was in a common enterprise with Ulland as a matter of law and that the election of remedies provision requires dismissal of Kelly's suit, we affirm.

## FACTS

■ The summary judgment standard mandates that we view the facts in the light most favorable to the nonmoving party, Kelly. *State Farm Fire & Cas. v. Aquila Inc.*, 718 N.W.2d 879, 883 (Minn. 2006). Ulland, a general contractor, won a bid to repair two bridges in Carlton County. Ulland subcontracted for Kraemer to provide the crane work needed to lift and place heavy sections of concrete box culvert. Ulland did not own any equipment capable of lifting the 22,000-pound steel-reinforced culvert sections. The culverts, once placed, create a channel for water to pass underneath the road.

This case centers on the placement of two concrete culverts on October 4, 2012, at a bridge on Highway 23, near the city of Wright. Ulland had a crew of four at the site: Terry Rassier, Richard Washburn, Jeremy Wright, and Matthew Kisley. Ulland also provided the culvert sections, specialized rigging equipment to connect the culvert sections to the crane cable, tie bars to connect the culvert sections, and a bulldozer. Kraemer provided the crane and a crew of two, Michael Bergstrom (the crane operator) and Roger Poukka (the signalman and oiler).

The bridge on Highway 23 runs north to south over a stream running west to east. Before the Kraemer crew arrived with the crane, Ulland had made preparations by diverting the stream through a temporary bypass culvert, draining the streambed, and removing the old culverts. To the east of the worksite, a powerline ran parallel to the road. Ulland marked off a 10-foot buffer zone around the powerline to avoid contact between the crane and the powerline. The parties do not dispute that it was necessary for the crane cable to remain at least 10 feet from the powerline to prevent electrocution.

The general procedure for laying the culverts was as follows: Rassier (Ulland), in the bulldozer, pushed each culvert section into the rigging area, where Wright (Ulland) and Poukka (Kraemer) attached it

to the crane. Bergstrom (Kraemer) operated the crane, lifting the culvert section over to the excavated bridge area and then lowering it. Washburn (Ulland), Kisley (Ulland), and Poukka manually guided the culvert section as it was lowered. Rassier brought the bulldozer into the streambed to push the culvert section into position after the crane set it down. Some combination of the four workers in the streambed then attached the lowered section to its neighbor and removed the crane rigging. As the spotter and signalman, Poukka was responsible for giving signals to Bergstrom to raise and lower the crane load and for preventing the crane from getting too close to the powerline.

As the crane lowered the last culvert section, Washburn grabbed it and was electrocuted. Poukka testified that, when he touched the culvert section, he felt a jolt. The crane operator, Bergstrom, testified that the crane cab was not insulated from electric shock, but that he did not feel any shock when Washburn and Poukka did. Workers at the site administered CPR and called for an ambulance, but Washburn was declared dead shortly after the ambulance arrived.

Washburn's survivors have received workers' compensation benefits through Ulland. Kelly is the mother of Washburn's two children and was appointed trustee for Washburn's next of kin to sue Kraemer for its alleged negligence in causing Washburn's death. Kraemer moved for summary judgment. Kraemer argued that it was engaged in a common enterprise with Ulland when Washburn was killed and that the election-of-remedies provision of the Minnesota Workers' Compensation Act prevents Kelly from bringing a civil action against Kraemer when her children have already recovered workers' compensation benefits from Ulland. *See* Minn. Stat. § 176.061, subds. 1, 4.

In its summary judgment motion, Kraemer relied on the depositions of the workers at the site, as well as an affidavit and report from a construction-risk expert. The expert identified a number of hazards at the construction site to which both Ulland and Kraemer employees were exposed. Kelly produced a report from a forensic engineering consultant. He opined that Washburn's death was caused by physical contact between the crane and the powerline, and that it was "mathematically implausible" that electricity "arced" or "jumped" from the powerline. Kelly's expert did not comment on any other potential hazards at the site.

The district court denied Kraemer's summary judgment motion. The court considered the three requirements of a common-enterprise defense: (1) the employers must be engaged on the same project, (2) the employees must be working together in a common activity, and (3) the employees must be working in such a fashion that they are subject to the same or similar hazards. *McCourtie v. U.S. Steel Corp.*, 253 Minn. 501, 93 N.W.2d 552, 556 (1958). Kelly conceded that the first requirement was met.

The district court found that genuine issues of material fact existed concerning the two remaining requirements: whether the Kraemer and Ulland employees were engaged in a common activity and whether they were subject to the same or similar hazards. The court found that "the Kraemer employees' duties were very different and arguably separate from those of the Ulland employees" and that there was "a question of fact as to whether or not the Ulland employees were even necessary for the Kraemer employees to perform the crane work and vice versa." Further, the district court concluded that "the risks associated with the Kraemer employees' jobs and Ulland employees' jobs were for the

most part distinct," finding that the crane operator Bergstrom was not in danger of electrocution and that the signalman Poukka was exposed to that danger only when he acted outside the scope of his duties at the job site.

A divided panel of the court of appeals reversed. The court reviewed the denial of summary judgment to determine whether the election-of-remedies provision prevented the district court from exercising subject-matter jurisdiction over Kelly's negligence action. *Kelly v. Kraemer Constr., Inc.*, No. A15-1751, 2016 WL 3961817, at *2 (Minn. App. July 25, 2016); *see McGowan v. Our Savior's Lutheran Church*, 527 N.W.2d 830, 833 (Minn. 1995) ("Where the [Workers' Compensation] Act provides the employee's exclusive remedy, the district courts have no jurisdiction."). The court of appeals determined that the common-activity requirement was met because "the two crews could not have accomplished the project by working separately." *Kelly*, 2016 WL 3961817, at *4. The court further held that "Kraemer offered the only expert evidence on summary judgment regarding general risks," which established that the two crews were subject to "similar, if not identical, hazards at the worksite." *Id.* at *5. The court accordingly concluded that Kraemer was entitled to summary judgment because it had established the three requirements of the common-enterprise test as a matter of law, and therefore the Minnesota Workers' Compensation Act provided Kelly's exclusive remedy. *Id.* A dissenting judge disagreed with the majority's evaluation of the similar-hazards requirement. *Id.* at *6 (Bratvold, J., dissenting).

## ANALYSIS

A district court may grant summary judgment when "there is no genuine issue as to any material fact" and one party "is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. We review the district court's summary judgment decision de novo. *Stringer v. Minn. Vikings Football Club, LLC*, 705 N.W.2d 746, 754 (Minn. 2005). We consider two questions: "whether a genuine issue of material fact exists, and whether an error in the application of law occurred." *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 341 (Minn. 1995). A genuine issue of material fact arises when there is sufficient evidence regarding "an essential element . . . to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). The evidence must be viewed in the light most favorable to the nonmoving party, Kelly. *See id.* at 72.

When a worker is injured "under circumstances which create a legal liability for damages on the part of a party other than the employer . . . at the time of the injury," and the third party carries proper workers' compensation insurance and was engaged in a "common enterprise" with the employer, the Minnesota Workers' Compensation Act mandates an election of remedies. Minn. Stat. § 176.061, subds. 1, 4. The party seeking recovery "may proceed either at law against [the third] party to recover damages or against the employer for benefits, but not against both." *Id.*, subd. 1. Washburn's survivors have received workers' compensation benefits through Ulland, and Kraemer carries workers' compensation insurance. Consequently, Kelly's suit may not proceed if Kraemer and Ulland were engaged in a common enterprise when Washburn was killed.

In *McCourtie v. United States Steel Corp.*, we set out a three-part test for the common-enterprise defense:

1) The employers must be engaged on the same project;

2) The employees must be *working. together* (common activity); and

3) In such fashion that they are subject to the same or similar hazards.

93 N.W.2d at 556. By placing emphasis on "the common activities of the workers rather than the common goals of the employers," *Schleicher v. Lunda Constr. Co.*, 406 N.W.2d 311, 313 (Minn. 1987), the test determines whether the employers have, "*in effect* . . . put the [employees] into a common pool," *Gleason v. Geary*, 214 Minn. 499, 8 N.W.2d 808, 814 (1943) (emphasis added). Kelly concedes that Kraemer and Ulland were engaged on the same project. The issue on appeal is this: Does a genuine issue of material fact exist regarding whether the employees were engaged in a common activity and subject to the same or similar hazards?

## I.

■ We first consider whether the Ulland and Kraemer crews were working together in a common activity. Kelly argues that the Kraemer and Ulland crews were not engaged in a common activity because they had distinct functions that were not interdependent. Kelly further contends that we should disregard favors or accommodations between crews when determining whether they were working together in a common activity, and that Poukka was acting as a volunteer when he manually guided the culvert sections and assisted with rigging.

Kraemer asserts, in contrast, that the key consideration is interdependence. It argues that the crews' work was interdependent because they could not have moved the culvert sections without working together and closely coordinating their tasks.

■ Cases analyzing the common-activity requirement have focused on the types of work performed, the interdependence of the work, and whether the work was closely coordinated. That the workers share a common goal is a necessary, but not sufficient, condition for finding a common activity. *See O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 895 (Minn. 1996).

In *McCourtie*, we concluded that the common-activity requirement was not met. There, a steel construction crew dropped a piece of steel 60 feet onto the plaintiff while he was installing plumbing below. 93 N.W.2d at 553-54. We noted that the "two employers perform[ed] different types of work, . . . steel construction work and plumbing," and that "performance of these jobs is not related except in a vague, general way looking toward the completion of a structure." *Id.* at 559. We concluded that "where the activities of the two sets of employees have nothing in common and do not share or join in any of the work between themselves," they are not working together for purposes of the common-enterprise defense. *Id.*

In *O'Malley v. Ulland Bros.*, by contrast, the circumstances showed that the test was met. Ulland, the general contractor for a highway resurfacing project, hired O'Malley's employer, Max Johnson Trucking, "to load, haul and stockpile sand, gravel and bituminous material to and from the construction site and to maintain the hauling road." 549 N.W.2d at 890. O'Malley was driving a dump truck to deposit sand into excavated areas and a Ulland employee was following him in a road grader. *Id.* at 891. As had often happened during that process, O'Malley's truck became stuck in the sand and the Ulland employee used his road grader to push the truck out. *Id.* at 891-92. O'Malley was injured in the process. *Id.* at 892. The Ulland employee testified that the two

crews had cooperated "all summer" and that they had shared equipment and trucks. *Id.* at 891.

We held that the employees were engaged in a common activity as a matter of law, reasoning that "both employers were engaged in the same space with coordination of their work as an integral part of the construction. It was not only contemplated that they would work together, it was essential to avoid chaos at the site." *Id.* at 896. Although "[m]erely working toward a common goal is not sufficient to constitute working together," we concluded that the crews' work in *O'Malley* was "interdependent" because the excavated roadway "could not have been filled without leveling by Ulland Brothers, nor could it have been filled without dumping by Max Johnson." *Id.* at 895, 896.

Applying these principles here, we agree with Kraemer that the crews were working together in a common activity. Neither crew could have accomplished the day's goal of setting the culvert sections without the contemporaneous assistance of the other crew; their work was "interdependent." *See id.* at 896. Kraemer relied on Ulland to push the culvert sections into the rigging area, attach them to the crane, and guide them into position. Ulland relied upon Kraemer to lift, swing, and lower the 22,-000-pound sections, which Ulland did not have the proper equipment to lift. The procedure was complicated enough that working together was "essential to avoid chaos at the site." *See id.* Further, Kelly's argument that the crews' duties were "distinct" is not dispositive. In *O'Malley*, the duties of the truck drivers and road grad-

ers were distinct, but still interdependent. *Id.*

Kelly argues that Poukka's alleged "volunteerism" should be excluded from the analysis. The court of appeals recognizes that "[t]he common-activity factor ignores volunteer acts in determining whether the two crews' work was interdependent." *Kelly*, 2016 WL 3961817, at *4 (citing *Carstens v. Mayers, Inc.*, 574 N.W.2d 733, 736 (Minn. App. 1998), *rev. denied* (Minn. Mar. 26, 1998)). In *Carstens*, the court of appeals held that advice and occasional assistance between the general contractor for a building foundation and its excavation subcontractor "does not give rise to a finding of interdependence but rather falls within the category of 'mere convenience,'" or "a 'favor or an accommodation.'" 574 N.W.2d at 736; *see also LeDoux v. M.A. Mortenson Co.*, 835 N.W.2d 20, 24 (Minn. App. 2013) (disregarding the lending of safety equipment between crews in analyzing the common-activity factor).

We need not decide whether the common-activity requirement of the *McCourtie* test excludes tasks performed as a "favor or an accommodation." *Carstens*, 574 N.W.2d at 736. Even ignoring those tasks that, Kelly maintains, were outside the scope of Poukka's assigned duties, the two crews were still working interdependently. Kelly points to testimony on the record that, viewed in the light most favorable to Kelly, could raise a genuine issue that Poukka's help with rigging, manually guiding, and de-rigging the culvert sections was outside the scope of his official role as the crane signalman, oiler, and spotter.[1]

---

1. Poukka physically assisted Wright in rigging the culvert sections before they were lifted into the streambed. But during Wright's deposition, the following exchange occurred:

> Q: In any event, you believe you served that function of doing that securing process on all of the culvert pieces, both on the north side and the south side, correct?
>
> A: Correct.

When the crane operator, Bergstrom, was asked whether it was part of Poukka's job to rig up the culvert sections, he responded that

But even if he did not assist with those tasks, the Ulland crew still would need him to oil the crane, spot, and signal to the crane operator to move the crane load, just as they would need the crane operator to use the crane to lift the culvert sections. Thus, the resolution of the common-activity requirement does not turn on whether we adopt the *Carstens* "favor or accommodation" rule.

The dissent maintains that the crews were not engaged in a common activity as a matter of law. Relying on *Schleicher v. Lunda Construction Co.* and *Kaiser v. Northern States Power Co.*, the dissent argues that the Kraemer and Ulland crews were not engaged in a common activity because each had a distinct role at the worksite and they did not closely collaborate like the crews in *O'Malley*. We disagree. The coordination between Kraemer and Ulland during the placement of the culverts was more akin to the coordination in *O'Malley*—in which the work could not have progressed without continuous cooperation between the crews—than the minimal interaction that occurred between workers in *Schleicher* and *Kaiser*.

In *Schleicher*, the plaintiff was employed by a concrete supplier and was injured while delivering concrete to a bridge construction project. 406 N.W.2d at 312. We held that the plaintiff and the employees of the general contractor for the project were not engaged in a common activity because their duties "overlapped minimally and were not interdependent except in the general way that construction work depends

on delivery." *Id.* at 313-14. In *Kaiser*, Northern States' employees had to shut off the natural gas in a hotel before the city's firefighters entered the building to fight a fire. 353 N.W.2d 899, 906 (Minn. 1984). With little analysis, we concluded that the Northern States' employees were not working together in a common activity with the city's firefighters because they "had distinct functions to perform" and the Northern States' employees "had no obligation to otherwise help fight the fire" after they had shut off the gas. *Id.* Unlike *Schleicher* and *Kaiser*, the coordination between the Kraemer and Ulland crews was complex and continuous during the entire day's work of placing the culverts. They did not merely work side by side; they worked interdependently to place the culverts.

Like the court of appeals, we determine that this excerpt from the deposition of Ulland's foreperson at the site, Terry Rassier, is illustrative:

Q: In setting the pipe on the north side and the south side and accomplishing that goal for the day, you needed the Kraemer guys and you needed your guys and you needed the two crews working together to get the goal accomplished, correct?

A: Yes, always.

*See Kelly*, 2016 WL 3961817, at *4. We hold that Kraemer met its burden of showing that no genuine issue of material fact exists concerning the second requirement, working together in a common activity. Though the two crews had distinct

---

"[h]e's to verify that it's good," and "[i]t depends on who you're working with."

Poukka also manually guided the culvert sections as they were lowered. The parties agree that manually guiding the culvert section was not technically part of Poukka's job, but Kraemer asserts that it was "something that Kraemer Crane Oilers had always done in the past on jobs like this one with Ulland."

During Rassier's deposition, the following exchange occurred:

Q: It is not [the signalman's] job to be in physical contact with that culvert; am I right?

A: True, but they do.

. . .

Q: He volunteered?

A: Correct.

functions, as the district court found, those functions were interdependent and required close, contemporaneous coordination. The Kraemer crew was working together in a common activity with the Ulland crew as a matter of law because the Kraemer crew could not have moved the culvert sections without the Ulland crew positioning, attaching, and maneuvering them, and the Ulland crew could not have placed the culvert sections without the Kraemer crew directing and operating the crane.

## II.

■ Next, we consider whether the Ulland and Kraemer employees were working "[i]n such fashion that they are subject to the same or similar hazards." *McCourtie*, 93 N.W.2d at 556. Our earlier cases' examination of shared risks sheds light on how this requirement should be evaluated.

In *McCourtie*, we held that a steel erection crew and a plumbing crew several stories below were not subject to the same or similar hazards. *Id.* at 562. While the steel workers were "in danger of being struck by moving beams and falling rivets," the plumbers were "exposed to being struck or hit by channel iron or other objects which might fall from places where other workmen are stationed above them" as well as "any of the hazards which are inherent in the occupation of a plumber." *Id.* at 561-62.

In *O'Malley*, we held that the general contractor's employees for a highway resurfacing project and the employees of a trucking subcontractor were subject to the same or similar hazards. 549 N.W.2d at 896-97. We noted that "the record contains the affidavits of supervisors of both companies at the project, and both state that all workers on the project were subject to risks of weather conditions, fire or explosion, collisions between vehicles or be-

tween vehicles and people." *Id.* After determining that there was "no credibility dispute" over the affidavits, we concluded that the "employees were subject to hazards which, while not identical, were sufficiently similar to satisfy the third factor of the *McCourtie* analysis." *Id.* at 897.

Kraemer produced an expert affidavit describing numerous shared risks at the job site. These risks included the following: being struck "by the crane load during any point of rigging, lifting, lowering or otherwise setting the load"; being struck by the bulldozer while it was transitioning from the road to the streambed; injury from failure of the crane cable, boom, or other moving parts; injury from the culvert section breaking apart while up in the air; "[t]he risk of an electrical shock injury or electrocution" by the powerline electrifying both the crane and "an undetermined ground perimeter zone"; and the risk of "slipping and falling in the muddy conditions in and around the dewatered streambed." Kraemer contends that we must look not only to the risk that caused injury but also to the "general risks" faced by the crews. Kraemer notes that the majority of its expert's affidavit goes unrebutted in the record.

Kelly asserts that Kraemer's proffered risks are too speculative and broad to meet the third requirement of the *McCourtie* test. Kelly argues that where responsibilities differ, risks attendant to those functions also differ, and the crews did not share functions giving rise to the same or similar risks.

■ As we have done in prior cases, we must evaluate the general hazards arising from the work performed at the site, and not only the hazard that resulted in injury. *See O'Malley*, 549 N.W.2d at 896-97 (considering the general hazards of "weather conditions, fire or explosion," and collisions "between vehicles and people," none of which materialized); *McCourtie*, 93 N.W.2d

at 561-62 (considering, among other hazards, "the hazards which are inherent in the occupation of a plumber," none of which materialized). This approach is consistent with how *McCourtie* itself describes the test—in terms of plural hazards, arising from the work that the crews perform. *See* 93 N.W.2d at 556 (stating that employees must be working together "*[i]n such fashion* that they are subject to the same or similar *hazards*" (emphasis added)). At the same time, we must be careful not to consider too broad a set of risks or the third requirement of the *McCourtie* test could become meaningless.[2]

In this particular case, though, the employees of both crews shared hazards that are not unduly speculative or broad. Kelly's attempts to distinguish the shared hazards identified by Kraemer's expert are not persuasive, and she has not pointed to evidence in the record rebutting them. *See Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993) ("Mere speculation, without some concrete evidence, is not enough to avoid summary judgment.").

As to the risk of electric shock, Kelly asserts that a genuine issue of material fact exists because "the record is conflict-ing about whether or not the crane's cab was insulated" and Poukka was in danger of shock only after he "voluntarily assumed an unassigned task" by manually guiding the culvert sections. She argues that hazards arising from offering to provide favors or accommodation should be excluded from the analysis of the similar-hazards requirement. As with the common-activity requirement, we do not need to determine whether exposure to hazards by volunteer acts should be excluded from the similar-hazards requirement because, even excluding volunteer acts, the Ulland and Kraemer crews were subject to the same or similar hazards.

Some record evidence suggests that electric shock was a shared risk, even if we ignore Poukka's decision to manually guide the culvert, because Bergstrom testified that his crane cab was not insulated from electric shock. Kelly asserts that whether Bergstrom's crane cab was insulated from electric shock is disputed, but does not point to any evidence in the record to support that assertion.[3] On the other hand, Bergstrom testified that he did not feel a shock when Washburn and Poukka did. Further, Kelly's expert averred that the risk of electrocution except by contact with the powerline was "mathematically implau-

---

**2.** We are mindful that interpreting the common-enterprise defense too broadly could pose its own problems. Subdivision 1 of Minnesota Statutes section 176.061, which requires the injured employee to elect a remedy, states a rule that has existed since the enactment of the workers' compensation system. *See O'Malley*, 549 N.W.2d at 892-93; *Gleason*, 8 N.W.2d at 812. By adding subdivision 4, which limits the application of the election-of-remedies provision to cases in which the third party and the employer are engaged in "furtherance of a common enterprise" or "accomplishment of the same or related purposes," the Legislature narrowed the applicability of this provision, which has the effect of enlarging the rights of some injured employees. Minn. Stat. § 176.061, subd. 4; *Gleason*, 8 N.W.2d at 812. To inter-pret the requirements of the common-enterprise test too broadly would permit the exception to swallow the rule. *See O'Malley*, 549 N.W.2d at 894 (holding that the court should apply an "even-handed standard" to interpretation of Minn. Stat. § 176.061).

**3.** Bergstrom testified that his crane cab was not insulated. Kelly characterizes the record as conflicting, but cites only to the complaint as offering a conflicting account. *See* Minn. R. Civ. P. 56.05 ("When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere averments or denials of the adverse party's pleading but must present specific facts showing that there is a genuine issue for trial.").

sible" because the amount of electricity traveling through the powerline was not high enough for electricity to arc or jump through the air. Ultimately, the record is not sufficiently developed for us to determine as a matter of law whether electric shock was a shared risk. We therefore conclude that a genuine issue of material fact exists as to whether electric shock was a shared risk.

But the record is clear that several other shared risks existed as the crews worked to install the culverts. Poukka spent the day going back and forth from the rigging area in the road to the streambed, and he worked side-by-side with three of the Ulland employees. All of these employees, by virtue of working near the crane load, were subject to the risk of being hit by the load, struck by a piece of the culvert section if it broke apart, or injured by a failure of the crane cable or boom. As Poukka and Wright walked up and down the stream bank between riggings, they were at risk of slipping in the muddy conditions of the dewatered streambed. And all employees in the streambed could have been hurt by the bulldozer as it traveled back and forth from the rigging area. These risks are not so speculative that they should be ignored, and they establish that the two crews were subject to similar hazards.[4]

 That Bergstrom was in the crane cab and not exposed to several of these

risks does not change the result. It would be unreasonable to require the employees of each crew to be subject to identical hazards, and such a strict interpretation is not what the test requires. Rather, the test requires that the employees be subject, at least, to similar hazards as they work together. *McCourtie*, 93 N.W.2d at 556. Even though crane operator Bergstrom and Rassier, the Ulland foreperson, were largely separate from the rest of the crews, this requirement was met here because Poukka, Washburn, Wright, and Kisley were subject to nearly identical hazards.

We hold that Kraemer met its burden of showing that no genuine issue of material fact exists on the third requirement: that the employees were subject to the same or similar hazards. The Kraemer crew was subject to the same or similar hazards as the Ulland crew as a matter of law because members of both crews could have been injured by movement of the crane load, failure of the crane, collision with a bulldozer on site, or slipping and falling in the dewatered streambed.

### CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

ANDERSON, J., took no part in the consideration or decision of this case.

---

**4.** At oral argument, Kelly suggested that a fact question existed as to whether Poukka could have performed his job outside the streambed, but the record refutes this argument. Bergstrom testified that Poukka was responsible for supervising the rigging to "verify that it's good" before giving the signal to raise the culvert section. The deposition of Rassier, the Ulland foreperson, confirms this testimony; he testified that he could not see who was manually rigging the culvert sections from the bulldozer, but that "it's usually the oiler because he comes up to give signs to the crane so that it's ready to go." Kelly does

not point to any evidence in the record to rebut Kraemer's supported assertion that Poukka was responsible for supervising the rigging of the culvert sections and giving signals to raise and lower the load. *See Erickson v. Gen. United Life Ins. Co.*, 256 N.W.2d 255, 259 (Minn. 1977) ("In order to successfully oppose a motion for summary judgment, a party cannot rely upon mere general statements of fact. . . ."). Poukka's responsibilities required him to be in and about the streambed, subject to the same hazards as most of the Ulland crew.

## DISSENT

MCKEIG, Justice (dissenting).

In 2012, Ulland Brothers, Inc., won a bid to repair two bridges in Carlton County. To perform the work, Ulland needed to install concrete culverts under the bridges. The culverts could not be installed without a crane. Lacking a crane or the expertise to operate one, Ulland hired a subcontractor (Kraemer Construction, Inc.) to do the crane work.

Ulland had a four-person crew for the project: Terry Rassier, Richard Washburn, Jeremy Wright, and Matthew Kisley. That crew worked for several days to prepare the worksite for the installation of the culverts, including diverting the stream, draining the streambed, and removing old culverts. Ulland provided all of the equipment and materials for the project, aside from the crane. Kraemer's crew worked on the project for only one day: October 4, 2012. On that day, Kraemer provided the crane and two employees: Michael Bergstrom and Roger Poukka. Bergstrom was the crane's sole operator. Poukka oiled the crane and signaled to Bergstrom when and how to move the crane load. Poukka also volunteered to help rig the culvert sections to the crane and guide the sections down as the crane lowered them. Three members of Ulland's crew rigged, de-rigged, and installed the culvert sections, while the other member operated a bulldozer.

The accident occurred during the installation of the final culvert section. A member of Ulland's crew rigged the culvert section to the crane, with Poukka's assistance. The Kraemer crane crew then maneuvered the culvert section into place:

Bergstrom operated the crane, while Poukka used hand signals to direct Bergstrom's lowering of the culvert section. As the section was lowered, Ulland's crew of four prepared to attach it to an already-installed portion of the culvert. Wright climbed inside the already-installed portion of the culvert to help connect the final section. Rassier waited nearby in the bulldozer, ready to push the section into place. And Washburn and Kisley prepared to guide the section down and de-rig it from the crane. Having completed his signaling, Poukka stood nearby to help guide the section down. When the culvert section was reachable, Washburn gripped it and was electrocuted. Poukka also felt a jolt after grabbing the culvert section with less force.

Today, the majority holds that the Kraemer crew's crane work was "interdependent" with the Ulland crew's rigging, de-rigging, and installation of the culvert section.[1] Because the majority misreads our common-enterprise jurisprudence and thereby forecloses a remedy for victims of work-related accidents, I respectfully dissent.

Under Minn. Stat. § 176.061, subdivisions 1 and 4, an injured employee must choose between receiving workers' compensation benefits from an employer and a common-law negligence action against a third party if the employer and the third party are engaged in furtherance of a common enterprise. To make out a common-enterprise defense, a third party must prove each prong of a three-part test:

> 1) The employers must be engaged on the same project;

---

1. In concluding that the two crews were engaged in a common activity, the majority properly declines to rely on Poukka's voluntary assistance in rigging and lowering the culvert section. Rather, the majority states, "Kraemer relied upon Ulland to push the culverts into the rigging area, attach them to the crane, and guide them into position. Ulland relied upon Kraemer to lift, swing, and lower the 22,000-pound sections, which Ulland did not have the proper equipment to lift."

2) The employees must be working together (common activity); and

3) In such fashion that they are subject to the same or similar hazards.

*McCourtie v. U.S. Steel Corp.*, 253 Minn. 501, 93 N.W.2d 552, 556 (1958). The parties here agree that Ulland and Kraemer were engaged on the same project. And I accept the court's conclusion that the two crews were exposed to similar hazards. But the court misapplies our precedent on *McCourtie*'s second prong: whether the workers were engaged in a common activity.[2]

In determining whether workers were engaged in a common activity, we have distinguished between work that is merely oriented toward a common goal and work that is truly a common activity. We have repeatedly stated that *McCourtie*'s common-activity prong is not satisfied simply because two sets of workers shared a common goal. *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 895 (Minn. 1996) ("Merely working toward a common goal is not sufficient to constitute working together."); *see also Schleicher v. Lunda Const. Co.*, 406 N.W.2d 311, 313 (Minn. 1987) (stating that two sets of employees were not engaged in a common activity even though "the goals of [the employees] were related"); *Kaiser v. N. States Power Co.*, 353 N.W.2d 899, 906 (Minn. 1984) (stating that two sets of employees were not engaged in a common activity despite having "a common goal").

Rather, workers engage in a common activity when their work is "interdependent." *See Schleicher*, 406 N.W.2d at 313. Only when "'the masters have joined forces and in effect have put the servants into a common pool'" is this standard met. *O'Malley*, 549 N.W.2d at 893 (quoting *Gleason v. Geary*, 214 Minn. 499, 8 N.W.2d 808, 814 (1943)). When two sets of workers have "distinct functions to perform," their work is not interdependent. *Kaiser*, 353 N.W.2d at 906.

Our precedent reflects this distinction. In *Schleicher*, two sets of workers had the common goal of laying concrete on a bridge. 406 N.W.2d at 312. One crew drove trucks that unloaded concrete, while the other crew ran a hopper and conveyor system that transported concrete from the trucks to the road. *Id.* "[T]here was some overlap" in the two crews' activities. *Id.* at 313. For example, the second crew sometimes lowered or raised chutes for the drivers in the first crew. *Id.* Additionally, if the drivers were delivering concrete too slowly, an employee from the other crew "would pitch in and help expedite the unloading." *Id.* Yet we concluded that "the employees were involved in basically different activities," so *McCourtie*'s common-activity prong was not satisfied. *Id.*

Likewise, in *Kaiser*, two sets of employees had the common goal of containing a hotel fire. 353 N.W.2d at 906. Workers from a power company cut off the gas supply to the building, after which firefighters evacuated tenants and extinguished the fire. *Id.* The two crews needed to coordinate their work to put out the fire, but they performed distinct tasks. We held that the workers were not engaged in a common activity. *Id.*

The same is true here. Ulland hired Kraemer as a subcontractor because Ulland did not own a crane and did not employ workers capable of operating one. Indeed, Ulland's subcontract is specifically for a "Crane Rental." As in *Schleicher* and

---

**2.** Here, we review the court of appeals' grant of summary judgment to Kraemer, so Kraemer bears "[t]he burden of showing an absence of factual issues" and Kelly "has the benefit of that view of the evidence most favorable to [her]." *Lowry Hill Props., Inc. v. Ashbach Constr. Co.*, 291 Minn. 429, 194 N.W.2d 767, 774 (1971).

*Kaiser*, two distinct teams coordinated to accomplish a goal. The task of moving the culvert section from the road to the streambed was handled exclusively by Kraemer employees: one operating the crane and the other signaling. Separately, the Ulland employees performed their assigned tasks: preparing the worksite and installing the culvert section. *Schleicher* and *Kaiser* show that this coordination of distinct tasks does not add up to the interdependent work necessary to satisfy *McCourtie*'s common-activity prong. Clearly, the companies did not put their employees into a common pool.

The majority's focus on the fact that both sets of workers were necessary to install the culverts is misguided. The majority states that the two crews' work was interdependent because "[n]either crew could have accomplished the day's goal of setting the culverts without the contemporaneous assistance of the other crew." And the majority describes as "illustrative" the following testimony of a Ulland foreperson:

Q: In setting the pipe on the north side and the south side and accomplishing that goal for the day, you needed the Kraemer guys and you needed your guys and you needed the two crews working together to get the goal accomplished, correct?

A: Yes, always.

But "[m]erely working toward a common goal is not sufficient to constitute working together." *O'Malley*, 549 N.W.2d at 895. Even if two sets of employees "all had to be available at the same time," they were not engaged in a common activity if "the duties of [the two work crews] overlapped minimally." *Schleicher*, 406 N.W.2d at 313.

Our opinion in *O'Malley* does not require a different conclusion. In *O'Malley*, a trucking crew drove dump trucks that hauled sand to fill in excavated areas, while a crew from the general contractor operated a road grader to level the new sand. 549 N.W.2d at 890-91. The dump trucks operated by the trucking crew repeatedly became stuck in the sand. *Id.* at 891. When the trucks became stuck, an employee of the general contractor used a road grader to push the trucks out of the sand. *Id.* The general contractor's employee "pushed out about 20 trucks an hour." *Id.* This vital and frequent assistance was typical of the crews' work arrangement.[3] Here, the Kraemer crew executed its duties independent of the Ulland crew. Unlike the trucking crew in *O'Malley*, the Kraemer crew neither required nor requested the assistance of any Ulland employee to complete its function at the site. Ulland and Kraemer employees coordinated their work, but they did not collaborate like the crews in *O'Malley*.

The majority recognizes that "interpret[ing] the requirements of the common enterprise test too broadly would permit the exception to swallow the rule." But the majority's conclusion that the separate work of the Ulland and Kraemer crews was interdependent improperly weakens *McCourtie*'s common-activity prong.

Accordingly, I respectfully dissent.

**3.** Describing the crews' interaction, an employee of the general contractor explained: [W]e'd send messages through each other, their boss or our boss would say, you know, we've got to get this done, or we need a different kind of material, or I'm going to have enough material. So we'd tell the Max Johnson people, they'd go tell their loader operator, or we'd borrow equipment back and forth once in a while. * * * [I]f they wanted something watered, Johnson did, because their trucks were hauling, we'd go water it for them. If we needed a truck to haul something, they'd give us a truck. If they wanted the road bladed, it was getting too rough for their trucks, I'd go blade it for them.

*Id.*

LILLEHAUG, Justice (dissenting).

I join in the dissent of Justice McKeig.